IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **SUZAN THOMPSON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 6:05-CV-0008-C** |
| | § | **ECF** |
| | § | **Referred to the U.S. Magistrate Judge** |
| **JO ANNE B. BARNHART,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

## REPORT AND RECOMMENDATION

**THIS MATTER** is before the court upon Plaintiff's complaint filed February 2, 2005, for

judicial review of the administrative decision of the Commissioner of Social Security denying

Plaintiff's application for a period of disability and disability insurance benefits under Title II of

the Social Security Act.  Plaintiff filed a brief in support of her complaint on June 21, 2005,

Defendant filed her brief on July 18, 2005, and Plaintiff filed her reply on August 4, 2005.  The

United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this matter to the United States

Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law,

and a proposed judgment.  This court, having considered the pleadings, the briefs, and the

administrative record, recommends that the United States District Judge reverse the Commissioner's

decision and remand this matter for further proceedings.

### I.   STATEMENT OF THE CASE

Plaintiff filed an application for a period of disability and disability insurance benefits on

July 2, 2002, alleging disability beginning September 24, 1999.  Tr. 23-24, 355-56.  Plaintiff's

application was denied initially and upon reconsideration.  Tr. 358-61, 363-67.  Plaintiff filed a Request for Hearing by Administrative Law Judge on February 5, 2003, and this matter came for hearing before the Administrative Law Judge ("ALJ") on October 28, 2003.  Tr. 23, 33, 35-72. Plaintiff, represented by an attorney, testified in her own behalf.  Tr. 37-63.  Michael Driscoll, a vocational expert ("VE"), appeared and testified as well.  Tr. 23, 64-71.  The ALJ issued a decision unfavorable to Plaintiff on January 13, 2004.  Tr. 20-30.

In his opinion the ALJ noted that the specific issue was whether Plaintiff was under a disability within the meaning of the Social Security Act.  He found that Plaintiff met the disability insured status requirements through March 31, 2002, and that onset of disability must be established on or before that date.  He found that Plaintiff had not engaged in substantial gainful activity at any time since September 24, 1999.  Tr. 24, 29.  He found that Plaintiff has "severe" impairments, including bilateral carpal tunnel syndrome and depression.  *Id*.  He further found that Plaintiff's severe impairments, singularly or in combination, were not severe enough to meet or equal in severity any impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1. *Id*.  The ALJ noted that he "specifically considered the listed impairments that address the musculoskeletal system and mental disorders."  Tr. 24.

The ALJ acknowledged that in making the RFC assessment, he must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence, based on the requirements of Social Security Ruling 96-7p.  Tr. 25.

The ALJ noted that medical evidence of record established that Plaintiff has a history of knee pain status post bilateral knee arthroscopy in 1995 and bilateral carpal tunnel syndrome.  *Id*. He noted that in March 1998, she was placed in wrist and forearm splints and was prescribed medication.  *Id*.  He discussed the findings upon an orthopedic consultative examination.  He also

discussed the results of EMG/nerve conduction studies in March 2000, which were negative for any evidence of carpal tunnel syndrome, although it appeared that Plaintiff had longstanding bilateral carpal tunnel syndrom and a mild right ulnar nerve injury at the elbow.  *Id.*  The ALJ noted treatment notes from March 2001 indicating that Plaintiff should walk and her report of being able to perform the activities of daily living without restriction.  *Id.*

The ALJ also noted Plaintiff's complaints of back and upper and lower extremity pain.  *Id.* He noted that a cervical MRI performed in Octoer 2002 revealed degenerative changes with foraminal narrowing of the C6 nerve root and that a lumbar MRI revealed mild disc bulging at L4-5. *Id.*  The ALJ noted that surgery was not recommended, and a physical examination in the following month was essentially normal.  *Id.*

The ALJ noted the results of an April 2003 functional capacity evaluation, wherein Plaintiff demonstrated decreased range of motion and limited ability to lift and carry.  *Id.*  Plaintiff was able to occasionally sit, stand, walk, and reach, but she was not able to squat, kneel, crawl, or climb.  *Id.* The evaluation further indicated that Plaintiff was able to occasionally balance and operate hand controls, could perform simple grasping, and was limited to lifting and carrying less than 10 pounds. Tr. 25-26.  The physical therapist opined that Plaintiff might be able to perform sedentary work if her carpal tunnel syndrome symptoms could be resolved.  Tr. 26.  Some tachycardia was also noted during the evaluation, although a subsequent carotid sonogram was essentially normal.  *Id.*

The ALJ noted that Plaintiff has been treated with medication by her family doctor for complaints of anxiety and depression, and counseling was recommended, but Plaintiff indicated that she could not afford to see a psychiatrist.  Tr. 26.  The ALJ also noted Plaintiff's treatment for gastroesophageal reflux disease ("GERD") and that she is obese.  *Id.*

The ALJ discussed Plaintiff's testimony regarding her medications and their side effects, the symptoms of her mental problems, her ability to lift, but not carry, one or two gallons of milk using

both hands, her ability to stand for 20-25 minutes, and her ability to walk up to 50 yards, limited by pain in her knees and cramps in her calves. Tr. 26-27. The ALJ noted Plaintiff's testimony as to her activities, including cooking with her husband's help, vacuuming every two weeks, driving, and shopping for groceries. *Id.* Plaintiff testified that 90% of her pain is in her neck and back; her pain is aggravated by movement; she also has pain in her knees, arms, and shoulders; she falls asleep when she sits; she has to alternate positions frequently; and she spends 5-6 hours a day lying down. Tr. 27.

The ALJ indicated that he recognized that Plaintiff may experience some pain or discomfort at times of overexertion but noted that even a moderate level of pain, standing alone, is not incompatible with the performance of certain levels of work activity. *Id.* He found that neither the medical evidence, or any reasonable inference therefrom, nor the nonmedical evidence in the record demonstrated that Plaintiff's ability to function was so severely impaired as to preclude the performance of any work activity. *Id.* He found that based on the evidence in the record, Plaintiff's statements concerning her impairments and their impact on her ability to work were not entirely credible. Tr. 29. The ALJ noted that she repeatedly denied any restriction of activities of daily living to her family physician and reported that she bears at least partial responsibility for the care of her grandchildren. Tr. 27.

The ALJ found that Plaintiff could not return to her past relevant work as a title searcher/recorder. Tr. 28-29. He noted that Plaintiff was considered a "younger individual" with a high school education and some college. *Id*; 20 C.F.R. §§ 416.963, 416.964.

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform, on a sustained basis, the requirements of light work activity, limited to jobs that do not require constant repetition of the same motion of the hands and are performed at the lower end of detailed instruction. Tr. 27. Having found that Plaintiff could not perform the full range of light work, the

ALJ turned to the testimony of the VE in determining whether Plaintiff was capable of making a vocational adjustment to other work despite her severe impairments. Tr. 28-30. The ALJ relied upon the testimony of the VE who indicated that a hypothetical person of Plaintiff's age, with Plaintiff's RFC and vocational history, could perform work which exists in the national economy, including the light work jobs of information clerk, with 4,100 jobs in Texas and 160,000 nationally; furniture rental consultant, with 2,900 jobs in Texas and 212,000 jobs nationally; and school bus monitor, with 2,800 jobs in Texas and 98,000 jobs nationally. *Id.* The VE further testified that if an individual with the same aforementioned restrictions could make a vocational adjustment to sedentary work, the hypothetical person could perform the sedentary jobs of check cashier, with 5,900 jobs in Texas and 198,000 jobs nationally; an animal shelter clerk, with 2,500 jobs in Texas and 130,000 jobs nationally; and a receptionist/greeter, with 10,000 jobs in Texas and 158,000 jobs nationally. *Id.* The ALJ, therefore, concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of his decision.

Plaintiff submitted a Request for Review of Hearing Decision/Order on January 23, 2004. Tr. 10-19. On November 5, 2004, the Appeals Council sent the requested copy of the hearing tape and granted a 25-day extension for the submission of any new evidence. Tr. 8-9. The Appeals Council issued its opinion on December 16, 2004, indicating that although it had considered the contentions raised in Plaintiff's Request for Review and the new evidence, it nevertheless concluded that there was no basis for changing the ALJ's decision and denied Plaintiff's request. Tr. 4-7. The ALJ's decision, therefore, became the final decision of the Commissioner.

On February 2, 2005, Plaintiff commenced this action which seeks judicial review of the Commissioner's decision that Plaintiff was not disabled.

## II.   STANDARD OF REVIEW

An individual may obtain a review of the final decision of the Commissioner by a United States District Court. 42 U.S.C. § 405(g).  The court's review of a denial of disability benefits is limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the proper legal standards. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002)(citing *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000)). Substantial evidence "is more than a mere scintilla and less than a preponderance" and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  The court will not re-weigh the evidence, try the questions *de novo*, or substitute its judgment for the Commissioner's, even if the court believes that the evidence weighs against the Commissioner's decision. *Masterson,* 309 F.3d at 272. "[C]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.* (quoting *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000)).

In order to qualify for disability insurance benefits or supplemental security income, a claimant has the burden of proving that he or she has a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity.  Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit. *Newton,* 209 F.3d at 452; *see* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1527(a)(1).

The Commissioner follows a five-step process for determining whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520; *Masterson*, 309 F.3d at 271; *Newton*, 209 F.3d at 453.  In this case, the ALJ found at step 5 that Plaintiff was not disabled because she retained the ability to perform work in the national economy.  Tr. 28-30.

## III.   DISCUSSION

Plaintiff claims that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly evaluate all of Plaintiff's impairments at step two of the sequential evaluation process; failed to properly evaluate Plaintiff's obesity; failed to properly evaluate Plaintiff's mental impairments; failed to perform a function-by-function assessment in determining Plaintiff's RFC; failed to evaluate the combined impact of all of Plaintiff's impairments; failed to properly evaluate Plaintiff's subjective symptoms; and failed to make necessary credibility findings.

The ultimate issue is whether the ALJ's decision is supported by substantial evidence.  The court, therefore, must review the record to determine whether it "yields such evidence as would allow a reasonable mind to accept the conclusion reached by the ALJ." *Loza v. Apfel,* 219 F.3d 378, 393 (5th Cir. 2000).

**A.    Whether the ALJ erred in evaluating the severity of Plaintiff's impairments at step 2 of the sequential evaluation process.**

Plaintiff notes that in his decision the ALJ only found that her depression and bilateral carpal tunnel syndrome were "severe" impairments.  Plaintiff argues that the ALJ failed to properly determine the severity of her other impairments.

The record demonstrates that in his opinion the ALJ found that Plaintiff has carpal tunnel syndrome and depression, impairments which were severe within the meaning of the regulations. Tr. 24.  The ALJ noted that a medically determinable impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities, citing 20 C.F.R. § 404.1521. *Id*.

Defendant agrees that the ALJ impliedly found that Plaintiff's other impairments, including myalgia/myositis, GERD, and Plaintiff's orthopedic impairments were not severe.  Defendant argues that the ALJ was not required to cite to *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir, 1985) in

evaluating the severity of Plaintiff's impairments because *Stone* only applies if the Plaintiff is denied disability at step 2 of the sequential evaluation process, and Defendant further argues that the ALJ was not required to determine whether Plaintiff's myalgia and GERD were severe because they were not medically determinable impairments. Defendant's arguments are without merit.

Under the Social Security Regulations, the severity of an impairment or impairments is considered at the second step of the five-step sequential analysis. *See* 20 C.F.R. § 404.1520. A claimant must show that he or she has a severe medical impairment before the claimant can be determined disabled. 20 C.F.R. § 404.1520(a)(4)(ii). The regulations further provide that an impairment must significantly limit the person's ability to do basic work activities in order to be considered severe. 20 C.F.R. § 404.1520(c). Thus,

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, [the Commissioner] will find that you do not have a severe impairment and are, therefore, not disabled.

*Id.*

The Supreme Court held that this "severity regulation" is valid on its face and "is not inconsistent with the statutory definition of disability." *Bowen v. Yuckert,* 482 U.S. 137, 146, 154, 107 S.Ct. 2287, 2293, 2298 (1987).

The Fifth Circuit has considered the severity regulation, both before and after the Supreme Court's decision in *Bowen v. Yuckert*. In *Stone*, 752 F.2d 1099, the Court approved of an earlier construction of the severity regulation that set this standard for determining whether a claimant's impairment is severe:

> [A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

*Id.* at 1101 (quoting *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984). In *Loza v. Apfel*, the Court held that the standard set forth in *Stone* remained the correct standard. *Loza,* 219 F.3d 378

at 392.   However, the Commissioner may require a claimant to make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work under this standard.  *Anthony v. Sullivan*, 954 F.2d 289, 293 n.5 (5th Cir. 1992).

The Court in *Stone* specifically required that ALJs and Appeals Councils must set forth the correct standard in their decisions by reference to the *Stone* opinion or to another opinion of the same effect or by including an express statement in the decision that the construction given to the severity regulation is the construction given to it in *Stone*.  Failure to do so will result in the Court's assumption that the ALJ or Appeals Council has applied an incorrect standard. *Stone,* 752 F.2d at 1106.  Moreover, the claimant need only make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work to satisfy this standard.  *Anthony*, 954 F.2d at 294..

Plaintiff argues that the ALJ used the wrong standard and that such failure requires remand to the Commissioner.  In his opinion the ALJ did not set forth the standard set forth in *Stone* or an opinion of the same effect nor did he include an express statement in the decision that the construction given to the severity regulation is the construction given in the *Stone* decision.  In fact, the ALJ stated that "a medically determinable impairment . . . is severe if it *significantly* limits an individual's physical or mental ability to do basic work activities," citing 20 C.F.R. § 404.1521.  Tr. 24 (emphasis supplied).  While the ALJ correctly stated the severity regulation as set forth in 20 C.F.R. § 404.1521, this regulation is constructed in a specific manner in the Fifth Circuit.  Defendant argues that neither Plaintiff's myalgia or GERD are "medically determinable impairments" and thus did not require the severity evalution.  Def. Brief at 6.  Defendant further argues that as the ALJ did not end his determination at step 2 of the sequential evaluation process, it is irrelevant that the ALJ did not refer to the *Stone* standard.  Def. Brief at 6-7.

In *Stone* the Fifth Circuit was concerned that too many claimants were being found "not disabled" at an early stage, that is, step 2 of the evaluation process.  Step 2 requires the ALJ to

determine whether a claimant has any impairments that are "severe." If the ALJ finds that a

claimant does not have any "severe" impairments at step 2, the evaluation process ends without

proceeding to steps 3-5, and the claimant is determined to be "not disabled." The Fifth Circuit in

*Stone* explained the reason for the standard that it had established:

> The prevailing idea, then, among the courts and Congress, is that some impairments
> are so slight that the ability of the claimant to work can be decided without a full
> evaluation of vocational factors. The factfinder is entitled to follow a sequential
> process that disposes of those cases at that early stage. But it is impermissible to
> make that disposition on the basis of a standard of severity that denies disability
> benefits to claimants who are in fact unable to perform substantial gainful activity.

752 F.2d at 1102-03.

Due to its concern and recent experience regarding cases that had been disposed of on the

basis of nonseverity (i.e., at step 2), the Fifth Circuit gave notice of how it would thereafter

determine whether the proper standard was applied and the sanction for noncompliance.

> In view of both the [Commissioner's] position in this case and our recent experience
> with cases where the disposition has been on the basis of nonseverity, we will in the
> future assume that the ALJ and Appeals Council have applied an incorrect standard
> to the severity requirement unless the correct standard is set forth by reference to this
> opinion or another of the same effect, or by an express statement that the
> construction we give to 20 C.F.R. § 404.1520(c)(1984) is used. Unless the correct
> standard is used, the claim must be remanded to the [Commissioner] for
> reconsideration.

*Stone*, 752 F.2d at 1106.

*Stone* appears to require remand in any case in which the ALJ fails to properly reference the

*Stone* standard. The Court's subsequent rulings, however, have clarified the holding to require

remand only when the ALJ failed to reference the *Stone* standard and the case was adjudicated at

step 2 of the sequential evaluation process. *See Chaparro v. Bowen,* 815 F.2d 1008 (5th Cir. 1987);

*Jones v. Bowen,* 829 F.2d 524 (5th Cir. 1987); *Lopez v. Bowen,* 806 F.2d 632 (5th Cir. 1986);

*McClatchy v. Barnhart*, 2004 WL 2810100 (W.D. Tex.).

The claimant argued in *Chaparro* that the Commissioner was presumed to have applied the incorrect standard because no reference was made to *Stone*. The issue was waived because it was not raised before the district court. The Court stated that, in any event, the "case did not turn on whether or not Chaparro's impairment was severe, but on whether Chaparro could return to his past relevant work – an inquiry unaffected by the test set forth in *Stone*." *Chaparro*, 815 F.2d at 1011. Thus *Chaparro* recognized that "the test set forth in *Stone*" does not apply to a case decided on whether a claimant could return to his past relevant work, a matter determined at step 4. The claimant's argument was considered irrelevant to the disposition of his case which advanced to step 4 for determination.

In *Jones* the claimant argued that the court failed to apply the correct legal standard in determining the severity of his impairments as required in *Stone*. 829 F.2d at 526 n.1. He argued that his hypertension was characterized as "mild" which resulted in the denial of benefits. *Id.* The Court held that there was no error similar to that found in *Stone* "where the claimant's request for benefits was prematurely denied based on an improper determination of "non-severity." *Id.* Thus the Court recognized that the *Stone* standard was based upon, and applicable only to, "premature" denials of disability which are based on improper determinations of "non-severity." That occurs only at step 2.

The claimant in *Lopez* cited *Stone* in support of his argument that the ALJ erred in the determination of the severity of his impairments. 806 F.2d at 634 n.1. The Court held that *Stone* did not apply because the ALJ did find that Lopez had severe impairments. *Id.* Claimants found to have severe impairments advance beyond step 2 in the evaluation process. Thus the Court held that the *Stone* standard does not apply to cases that advance beyond step 2.

It follows that in cases adjudicated at step 3, step 4, or step 5 of the evaluation process, the ALJ's failure to make reference to the standard established in *Stone* does not, without more, require

remand.  Plaintiff argues that this error by the ALJ distorted and affected the remaining of his decision, both in terms of evaluating the combined impact of Plaintiff's impairments and in determining her RFC.  The court therefore considers Plaintiff's other claims of error to determine whether the ALJ applied incorrect legal standards or whether his decision is not supported by substantial evidence in the record.

**B.      Whether the ALJ failed to properly evaluate Plaintiff's obesity.**

Plaintiff notes that the evidence of record demonstrates that she has suffered from obesity during the relevant time period.   She notes that the ALJ indicated that she was obese in his opinion but argues that he failed to otherwise evaluate her obesity as a medically determinable impairment in the manner required by the Social Security Ruling 02-01p (September 12, 2002)("SSR 02-1p").

SSR 02-01p was adopted when § 9.09 of the Listing of Impairments applying to obesity was deleted because cases under this listing "indicated that the criteria in the listing were not appropriate indicators of listing-level severity" and "the criteria in listing 9.09 did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity." SSR 02-1p.  Under this Ruling, the Commissioner will not make assumptions about the severity or functional effects of obesity combined with other impairments.  *Id.*  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  *Id.*  Evaluation in each case is based on the information in the case record.  *Id.*  When obesity is identified as a medically determinable impairment, the Commissioner will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments identified.  *Id.*

In his opinion the ALJ noted that Plaintiff was obese, weighing in excess of 200 pounds.  Tr. 26.  However, the ALJ did not otherwise discuss Plaintiff's obesity.

In a progress note dated January 19, 2000, Dr. Kenneth D. Leckie noted that Plaintiff had a "good active physical exam." Tr. 207. Dr. Leckie referred her to Dr. A. Price Burdine, who indicated in a progress note dated February 8, 2000, that Plaintiff was mildly obese and walks without difficulty, with essentially normal gait and station. Tr. 206. Dr. Burdine's impression was bilateral carpel tunnel. *Id*. He further noted that Plaintiff's knees would be addressed in a future visit. *Id*. Dr. Burdine noted on March 15, 2000, that Plaintiff continues to have problems with her knees and both elbows and hands. Tr. 205. X-rays indicated no acute change. *Id*. Dr. Burdine opined that Plaintiff "simply [has] pain in the knee" and indicated that she might have a patellar compression which would benefit from lateral release. *Id*. An April 4, 2000, progress note indicates Plaintiff's complaint of difficulty swallowing. *Id*. Plaintiff was advised to quit smoking. *Id*.

Plaintiff sought treatment from Dr. Leckie on May 8, 2000, complaining of depression. Tr. 203. Dr. Leckie's impression was anxiety, mild depression, reflux, and insomnia. *Id*. He prescribed medication for anxiety and insomnia, as well as for GERD. *Id*. Plaintiff reported that her depression was better and she was to continue counseling. *Id*. Dr. Leckie indicated that he also briefly discussed diet with Plaintiff. *Id*. Plaintiff was treated for abscesses in May 2000. Tr. 202-03. She also complained of low back pain, and upon examination, her paravertebral muscles were tender to palpation. Tr. 202. Dr. Leckie noted on July 31, 2000, that Plaintiff might possibly have sleep apnea. *Id*. However, results of a polysomnography did not indicate sleep apnea, although the test did show disordered sleep. Tr. 201. Plaintiff also reported a lot of discomfort with her knees. *Id*. On October 9, 2000, Dr. Leckie's impressions were disordered sleep; depression with anxiety, improved; and dysphagia. Tr. 198. He noted upon examination that Plaintiff had some paracervical spasm. *Id*. A note indicates that on January 31, 2001, Plaintiff asked that Dr. Leckie complete an application for a permanent handicapped parking placard, due to her knee pain. Tr. 196. The file

note indicates that Plaintiff was told to ask Dr. Burdine to fill it out, but he refused, and Dr. Leckie agreed to fill it out only for a temporary permit. *Id.*

Dr. Leckie indicated in his progress note dated February 5, 2001, that Plaintiff reported that her legs hurt when supine, but she experienced only a little discomfort when walking. Tr. 194. Plaintiff also reported pain in her shoulders and was prescribed medication. *Id.* Dr. Leckie opined on February 26, 2001, that Plaintiff's depressive disorder and shoulder problem was unchanged, but her reflux and myalgia/myositis had deteriorated. Tr. 190. He prescribed medication. *Id.* On March 26, 2001, Dr. Leckie noted that Plaintiff's reflux had deteriorated, but her depression had improved, and he prescribed Pepcid for her GERD. Tr. 187.

Plaintiff was examined by Dr. Robert J. Danbert, a gasteroenterologist, on April 12, 2001. Tr. 178-82. Dr. Danbert scheduled Plaintiff for an EGD, which was essentially normal. Tr. 177, 181. On April 23, 2001, Dr. Leckie noted upon mental status examination that Plaintiff was not depressed, anxious, or agitated, although she was experiencing insomnia. Tr. 174-75. He prescribed medication. *Id.* He noted that Plaintiff's depression was improved on May 21, 2001, and prescribed medication for smoking cessation. Tr. 170-71. Dr. Leckie noted no change in Plaintiff's existing problems on August 13, 2001, advised Plaintiff not to smoke in the home, discussed Zyban and Wellbutrin with her, and also discussed exercise with her. Tr. 164. On October 15, 2001, Plaintiff saw Dr. Leckie complaining of increased discomfort in her muscles and legs and increased hot flashes. Tr. 160. He noted upon mental status examination that Plaintiff's mood was depressed, and his impression was that Plaintiff's depression had deteriorated. Tr. 161. Dr. Leckie strongly urged Plaintiff to undergo counseling and indicated that she should not smoke inside the house. *Id.* In his next progress note dated January 15, 2002, Dr. Leckie noted that Plaintiff's depression had deteriorated and strongly urged her to seek counseling and to exercise. Tr. 156. On February 26, 2002, Dr. Leckie noted that Plaintiff had not gone for counseling, that she was concerned about her

weight, and that she reported being tired all the time.  Tr. 151.  Plaintiff's conditions were noted as

unchanged on May 28, 2002, and upon examination, Dr. Leckie noted no depression, anxiety, or

agitation.  Tr. 301-02.  Plaintiff reported that she aches all over, was able to walk 5-7 minutes, was

still smoking outside the house, and was unable to obtain counseling through MHMR.  Tr. 300.  A

progress note dated August 29, 2002, reports Plaintiff's complaint of being fatigued all the time.

Tr. 295.  Dr. Leckie adjusted Plaintiff's medication for depression and indicated that she should

walk for 10 minutes.  Tr. 296.  Plaintiff complained of increased back pain and irritability on

September 27, 2002.  Tr. 292.  Dr. Leckie prescribed medication, and he indicated that Plaintiff

should apply cold to her back 20 minutes only and that she should walk 5-10 minutes daily.  Tr. 294.

A lumbar spine x-ray was taken, and no acute abnormalities were identified.  Tr. 291.  Dr. Leckie's

progress note dated October 7, 2002, indicates Plaintiff's report of no change in moodiness and

depression since stopping both Celexa and Effexor.  Tr. 285.  She also reported some increased back

discomfort and a tingling sensation in her knees after walking 1½ blocks.  *Id.*  Dr. Leckie scheduled

a lumbar spine CT to check for spinal stenosis.  Tr. 286.  On October 21, 2002, Dr. Leckie noted that

Plaintiff's depression was improved.  Tr. 283.

Dr. Robert Alexander examined Plaintiff on October 22, 2002, with regard to her low back

pain.  Tr. 279.  Dr. Alexander noted Plaintiff's report of depressive complaints and her ability to

walk only one or two block due to leg complaints.  *Id.*  He indicated that Plaintiff should undergo

an MRI.  Tr. 280.  The MRI indicated a broad based annular bulging at the L4-5 level and a

moderate right-sided and mild to moderate left-sided up-down foraminal narrowing at L4-5.  Tr.

212.  After the MRI, Dr. Alexander indicated his impression of a history of bilateral leg complaints

unexplained by the lumbar study, lumbar strain, and facet arthrodosis or lumbar spondylosis.  Tr.

277.  He recommended that Plaintiff use an anti-inflammatory and engage in activities as tolerated,

and he opined that surgery was not a consideration.  *Id.*

Dr. Leckie removed a cyst on Plaintiff's neck in November 2002. Tr. 274-76. He noted on November 27, 2002, that Plaintiff had been prescribed Feldene for her low back pain which was moderately helpful in relief of joint discomfort and very helpful in improved sleep. Tr. 270. He noted that Plaintiff's back pain and tobacco use had improved and noted no depression, anxiety, or agitation. Tr. 272. He adjusted Plaintiff's medications and opined that she should walk twice per day. *Id*. Plaintiff underwent a laparoscopic cholecystectomy in March 2003 after developing a gallstone. Tr. 246. Dr. Leckie noted on September 18, 2003, that Plaintiff reported that she was not doing well after having lost her brother two months previously. Tr. 234.

Plaintiff underwent a functional capacity examination on April 15, 2003 upon Dr. Leckie's referral. Tr. 304-08. The physical therapist indicated that Plaintiff was not able to squat, kneel, crawl, or perform repetitive tasks with her hands. Tr. 305. He opined that if Plaintiff's carpal tunnel syndrome could be resolved with either medical or surgical intervention, then she would probably qualify for work at the sedentary physical demand level. *Id*. He advised Plaintiff to undertake a walking or aquatics program to improve her overall fitness level. *Id*.

Plaintiff argues that the ALJ failed to consider or address any of the factors that SSR 02-01p requires in evaluating the impact of her obesity on her ability to work. However, none of these references in the record indicates that Plaintiff's obesity increased the functional limitations in combination with her other impairments beyond the degree recognized by the ALJ and incorporated into his RFC finding. *See* SSR 02-01p. While there are references in the record to her obesity, the record demonstrates that her medical providers urged Plaintiff to exercise and did not note any limitations imposed by her obesity nor did they indicate that her obesity increased the functional limitations imposed by her other impairments. While SSR 02-01p specifically notes that in cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity, there is no evidence in the record to demonstrate that Plaintiff's obesity, considered in

combination with her mental impairments such as depression, has increased the severity or functional limitations of such impairment. *Id*. SSR 02-01p specifically notes that [t]he fact that obesity is a risk factor for other impairments does not mean that individuals with obesity necessarily have any of these impairments. It means that they are at greater than average risk for developing the other impairments." At step 2, obesity is a "severe" impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities. *Id*. The ALJ impliedly found that Plaintiff's obesity was not a "severe" impairment. SSR 02-1p does not require the ALJ to make any assumptions about the severity or functional effects of obesity combined with other impairments, noting that obesity in combination with another impairment *may or may not* increase the severity or functional limitations of the other impairment and providing that in each case the determination of the effect of obesity is based on the information in the case record. Despite the extensive and detailed medical evidence provided by Plaintiff's examining and treating sources, the record contains no evidence demonstrating that Plaintiff's obesity, singularly or in combination, limited Plaintiff's ability to do basic work activities. Therefore, I find that the ALJ did not err in evaluating Plaintiff's obesity.

## C. Whether the ALJ committed reversible error by failing to properly evaluate Plaintiff's mental impairment.

Plaintiff argues that the ALJ erred by failing to properly evaluate her mental impairments using the special technique set forth in 20 C.F.R. § 404.1520a. If the ALJ determines that the claimant has a medically determinable mental impairment, he must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment. 20 C.F.R.§§ 404.1520a and 416.920a. He is required to evaluate the degree of functional loss resulting from Plaintiff's mental impairments as set forth in 20 C.F.R.§§ 404.1520a and 416.920a. *Boyd v. Apfel*, 239 F.3d 698, 705

(5th Cir. 2001). The ALJ must evaluate the claimant's limitations in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation, the part "B" criteria. A five-point scale is used to rate the degree of limitation in the first three of those functional areas. 20 C.F.R. § 416.920a (c)(1)-(4). These four separate areas are deemed essential for work. *Boyd*, 239 F. 3d at 705 (citing 20 C.F.R. § 404.1520a(b)(3)). The written decision of the ALJ must incorporate pertinent findings and conclusions based on the technique and must include a specific finding as to the degree of limitation in each of the functional areas described. 20 C.F.R. § 416.920a(e)(2). The Psychiatric Review Technique form ("PRTF") represents one way in which such findings may be documented. 20 C.F.R. § 404.1520a(e). After the ALJ rates the degree of functional limitation resulting from any mental impairment(s), the judge determines the severity of such impairment(s). 20 C.F.R. § 404.1520a(d). If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment "not severe" at step 2 of the sequential evaluation process. 20 C.F.R. § 404.1520a(c)(1). If the ALJ finds that the mental impairment is "severe" under 20 C.F.R. § 404.1520a(c)(1), the ALJ must then determine if it meets or equals a listed mental disorder under 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00-12.09. 20 C.F.R. § 404.1520a(c)(2). If the impairment is severe but does not reach the level of a listed disorder, then the ALJ must conduct an RFC assessment. *Boyd*, 239 F.3d at 705.

Plaintiff contends, and Defendant concedes, that the ALJ did not address the part "B" criteria when he evaluated Plaintiff's mental impairment. Plaintiff further argues that the ALJ failed to conduct a mental RFC assessment. Defendant argues, however, that the failure of the ALJ to evaluate the functional limitations imposed by Plaintiff's mental impairment under the part "B" criteria does not constitute reversible error because the ALJ clearly considered the limitations imposed by Plaintiff's mental impairment and accommodated a mild limitation in concentration by incorporating a limitation to the lower end of detailed work into his RFC assessment.

-18-

As described in Soc. Sec. Ruling 96-8p (July 2, 1996)("SSR 96-8p"), the limitations identified in the part "B" criteria "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." Section 12.00 of the Listing of Impairments notes that each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). *See* 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.00. This section notes that the part "B" and "C" criteria describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. *Id.* It notes that the functional limitations indicated under parts "B" and "C" must be the result of the mental disorder described in the diagnostic description, manifested by the medical findings. *Id.*

Section 404.1520a(d)(2) describes the evaluation of a severe mental impairment at step 3 of the sequential evaluation process, noting that the adjudicator determines if the mental impairment meets or is equivalent in severity to a listed mental disorder "by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder." The ALJ found that Plaintiff's mental impairment was "severe" under the applicable regulations at step 2 of the sequential evaluation process. At step 3, the ALJ found that Plaintiff's mental impairment did not meet or equal in severity the criteria of any listing in the Listing of Impairments. Tr. 24. In making his RFC assessment, the ALJ found that Plaintiff was limited to work at the low end of detailed instruction. Tr. 29. However, in his opinion, although the ALJ discussed Plaintiff's reports of her symptoms and her daily activities, the ALJ does not address the functional limitations, if any, imposed by Plaintiff's mental impairment, either by evaluating her depression under the part "B" criteria or by completing a mental RFC assessment. SSR 96-8p specifically notes that the evaluation under the part "B" criteria, used at steps 2 and 3,

is distinct from the RFC finding used at steps 4 and 5 of the sequential evaluation process. The Ruling further notes that the " RFC is an issue only at steps 4 and 5 of the sequential evaluation process." *Id*. Functional limitations are evaluated on the PRTF to determine the extent to which the mental impairment(s) interferes with the claimant's ability to function independently, appropriately, effectively, and on a sustained basis. 20 CFR § 404.1520a(c)(2). "Residual functional capacity" refers to the ability to perform work despite physical or mental impairments. 20 C.F.R. § 404.1545(a). While findings of impairment under the part "B" criteria would clearly be relevant to the RFC determination, a finding of such impairment at step 2 does not require that such an impairment be incorporated into the RFC finding if the ALJ finds that the impairment does not limit the claimant's ability to perform work. However, in this matter the ALJ failed to evaluate Plaintiff's mental impairment under the part "B" criteria and also failed to indicate the specific limitations imposed by Plaintiff's mental impairment in making his RFC assessment. Although the ALJ did indeed incorporate a limitation to work at the lower end of detailed instruction, his decision does not indicate the reason for this limitation in his RFC finding. The court is unable to determine the basis for this limitation in the ALJ's decision and is unable to determine the limitations which the ALJ found were imposed by Plaintiff's mental impairment. I find that the ALJ erred by failing to appropriately evaluate and consider Plaintiff's mental impairment and by failing to apply the proper legal standard for evaluating such impairment. This error is compounded by the ALJ's step 2 severity finding, which fails to address Plaintiff's knee and back impairments, although they were discussed in the opinion and throughout the record. As Defendant correctly notes, "procedural perfection in administrative proceedings is not required." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988). The court will not reverse the decision of an ALJ for lack of substantial evidence where the claimant makes no showing that he was prejudiced by the deficiencies he alleges. *Carey v. Apfel*, 230 F.3d 131, 143 (5th Cir. 2000)(citing *Brock v. Chater*, 84 F.3d 726, 729 (5th Cir. 1996)).

Procedural improprieties will constitute a basis for remand "only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). However, a consideration of the improprieties noted above calls into question the existence of substantial evidence to support the ALJ's severity determination at step 2 and his determination of Plaintiff's RFC at step 3 of the sequential evaluation process. Accordingly, I find that the ALJ's decision is not supported by substantial evidence in the record.

Because further evaluation of the severity of Plaintiff's medically determinable impairments, as well as consideration of the functional limitations imposed by her mental impairment, could materially affect the ALJ's credibility determination and RFC assessment, I do not reach Plaintiff's additional claims of error. Upon remand, the ALJ should further consider the severity of Plaintiff's impairments and should further evaluate the limitations imposed by Plaintiff's mental impairment in making his RFC assessment.

## IV.    CONCLUSION

Based upon the foregoing discussion of the issues, the evidence, and the law, this court recommends that the United States District Judge reverse the Commissioner's decision and remand this matter for further proceedings in accordance with this recommendation.

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1) and Rule 4 of Miscellaneous Order No. 6, For the Northern District of Texas, any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections on or before **3:00 p.m. on March 30, 2006**. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party

from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendations on or before **3:00 p.m. on March 30, 2006**, shall bar the aggrieved party from appealing the factual findings and legal conclusions of the United States Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

DATED this 16th day of March, 2006.

**PHILIP R. LANE**
**UNITED STATES MAGISTRATE JUDGE**